WOW & FLUTTER MUSIC, HIDEOUT RECORDS AND DISTRIBUTORS, INC., Pop N' Roll Music and Stygian Songs, Plaintiffs,

v.

LEN'S TOM JONES TAVERN, INC., and Len Cipriana, Defendants.

No. Civ–82–33C.

United States District Court, W.D. New York.

April 12, 1985.

Hancock & Estabrook, Syracuse, N.Y., for plaintiffs; David E. Peebles, Syracuse, N.Y., of counsel.

Villani and Grow, Lyons, N.Y., for defendants; Anthony J. Villani, Lyons, N.Y., of counsel.

CURTIN, Chief Judge.

Plaintiffs, the proprietors of copyrights of musical compositions, seek summary judgment on four claims of copyright infringement. They request an injunction prohibiting further infringement, as well as statutory damages and costs, including reasonable attorney's fees.

Defendant Len Cipriana was the owner of Len's Tom Jones Tavern, Inc., in 1981, the year in which the claimed infringements occurred. In the summer of 1983, the corporation was dissolved, and ownership of the tavern, now the Tom Jones, was transferred to his two daughters. Plaintiffs in this action are each members of the American Society of Composers, Authors and Publishers [ASCAP], to which they have granted a non-exclusive right to license non-dramatic public performances of their copyrighted musical compositions.

### Liability

Plaintiffs have submitted affidavits and exhibits sufficient to support their claim of proprietorship of the copyrights involved in this action. Copyright registration certificates provide *prima facie* evidence of the truth of the facts therein. 17 U.S.C. § 410(c). Defendants offer no evidence to dispute plaintiffs' ownership of the copyrights or their validity.

Defendants also offer no evidence to dispute plaintiffs' proof of public performance of the musical compositions in question.

Plaintiffs offer the affidavit of ASCAP representative, William J. Campbell III, establishing that the compositions, "Ride Like the Wind," and "Too Much Time on my Hands," were publicly performed at the Tom Jones Tavern on the night of September 4–5, 1981. On that night, a disc jockey played recorded music over a sound system.

To establish public performance of the other compositions in question, plaintiffs offer the affidavits of Heather Haven and Norman Michaels, also ASCAP representatives. Their affidavits indicate that the songs, "All Night Long," and "Betty Lou's Getting Out Tonight," were performed at the tavern on June 20, 1981. Although a band was playing that evening, it appears from the investigators' notes that both compositions were played on the juke box during band intermissions.

Defendant Cipriana concedes that he has no knowledge of whether these compositions were performed on these evenings (Item 25, p. 45 and 46). All ASCAP representatives stated that they have musical backgrounds, are familiar with the compositions in question, and heard them performed at the tavern (Item 26). Defendants offer nothing to rebut this.

Defendants did suggest that they might wish to bring in two bands as third-party defendants and obtain their testimony as to infringement (Item 17). However, as has been noted, the compositions were performed by means of a juke box or records played by a disc jockey, not live bands. Nonetheless, the court gave defendants time to bring in a third-party defendant, which was never done (Item 19).

In view of the lack of evidence to the contrary, the court finds the compositions were publicly performed by defendants.

Finally, Mr. Cipriana admits that he did not have permission to perform the compositions. Since he was the manager of the day-to-day activities of the tavern, defendant Cipriana is individually liable for the copyright infringements. *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 913 (D.Conn.1980). Summary judgment is granted on the issue of liability.

### Remedies

#### A. *Injunction*

Defendants are permanently enjoined from infringing on plaintiffs' copyrights in any manner. 17 U.S.C. § 502. While defendant Cipriana no longer owns the tavern and claimed at his deposition that he does not manage it, he still works there part-time. (Item 25, p. 56.) He is enjoined from causing or permitting the infringement of plaintiffs' copyrights through public performance or in any other fashion.

#### B. *Damages*

Plaintiffs also seek damages under 17 U.S.C. § 504. Plaintiffs have elected to forego actual damages and to recover statutory damages instead. 17 U.S.C. § 504(c).

Under section 504(c)(1), plaintiffs would be entitled to damages ranging from $250

to $10,000 simply upon a showing of infringement. But plaintiffs are proceeding under section 504(c)(2) and have sustained the burden of proving that the infringement was committed willfully. Proof of this would raise the ceiling on plaintiffs' damages to $50,000. Plaintiffs have requested the court to award $2,000 for each infringement (Item 26, Peebles affidavit).

Defendants' sole response to plaintiffs' motion for summary judgment has been an affidavit of defendant Cipriana (Item 29). Through this affidavit, defendants seek to escape summary judgment on the issue of willful infringement by putting Mr. Cipriana's state of mind in issue. The Second Circuit has cautioned against disposition on summary judgment when mental state is at issue. (*See Katz v. Goodyear Tire and Rubber Company*, 737 F.2d 238 (2d Cir. 1984.) However, for the reasons discussed below, the court believes there are sufficient undisputed material facts on the record to make this issue appropriate for summary judgment.

For the purposes of the copyright statute, "willfully" means with knowledge. 3 Nimmer on Copyright, § 14.04[B][3] (1984).

The question is posed as to what "willfully" means in this context. In other contexts it might simply mean an intent to copy without necessarily an intent to infringe. It seems clear that as here used "willfully" means with knowledge that the defendant's conduct constitutes copyright infringement. Otherwise there would be no point in providing specially for the reduction of minimum awards in the case of innocent infringement since any infringement which was nonwillful would necessarily be innocent. This seems mean, then, that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not "willful" for these purposes.

*Id.* at 14–28 (footnotes omitted).

The treatise cites two cases in which, even in the absence of proof of actual knowledge, willfulness was found. In *Fallaci v. New Gazette Corp.*, 568 F.Supp. 1172 (S.D.N.Y.1983), it was found that de-

fendant, a publisher of a copyrighted newspaper, "was or should have been aware" that its conduct was infringing. *Id.* at 1173. In *Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730 (S.D.N.Y. 1981), the court found that under the circumstances in that case, in which there was no specific proof of actual knowledge, "at the very least, [defendant] acted with a reckless disregard for the rights plaintiff had in the design." *Id.* at 733. This interpretation of "willfully" seems to the court to be sound.

■ The burden of showing "willfulness" is with plaintiffs. For the reasons discussed above, this burden can be met by showing that defendants should have known their conduct was infringing or acted in reckless disregard of plaintiffs' rights.

In his affidavit in opposition to plaintiffs' motion for summary judgment, Mr. Cipriana states that he believed the copyright laws involved only public performances by live bands, not records or juke boxes (Item 29).

Plaintiffs produced documents covering a span of nine years, which demonstrates that ASCAP repeatedly attempted to contact defendant Cipriana in person at the tavern or by letter. ASCAP doggedly sought to inform Mr. Cipriana that his tavern was infringing the copyrights of its members and continually requested that he sign a licensing agreement.

Mr. Cipriana does not dispute receiving letters, visits, or phone calls from ASCAP. At his deposition of July 11, 1984, defendant said that he did not remember receiving specific letters from ASCAP but does recall seeing mailings from the Society over the years.

Mr. Cipriana: I never opened any of them things, I just threw them away.

Mr. Peebles: That go for all of your mail or just some mail in particular?

Mr. Cipriana: If it had ASCAP on it I just discarded it.

Item 25, p. 72.

Mr. Cipriana reacted similarly to visits and telephone calls from ASCAP representatives:

Mr. Peebles: Did any ASCAP representatives ever ask you if you would be licensed with ASCAP?

Mr. Cipriana: I don't believe I even talked to any of them that long. They come in and said they are from ASCAP, I just told them to leave.

\*  \*  \*  \*  \*  \*

Mr. Peebles: Do you remember hanging up on any after they told you they were from ASCAP?

Mr. Cipriana: I would have if they told me it was ASCAP. I wouldn't have even talked to them.

*Id.* at 76–77, 79.

In one of the letters sent to Mr. Cipriana dated April 13, 1977, he was told that the licensing fee would be based on several factors, including an orchestra three nights per week and *"Mechanical-Records-3 nights per week."* (Item 26, Exh. 15.) This letter was sent by certified mail, and Mr. Cipriana signed the return (Item 25, p. 74).

In another letter, also sent by certified mail and dated March 21, 1975, the factors identified for a licensing fee were, among others, "Orchestra & Mechanical (juke box)." (Item 26, Exh. 11.)

This is not the first time these defendants have appeared before this court in a copyright infringement action. In *Bruce Springsteen, et al. v. Len's Tom Jones Tavern, Inc., and Len Cipriana,* CIV–79–543C, plaintiffs, also ASCAP members, alleged five instances of infringement of musical compositions (not the same as those at issue in the instant case). That case was filed on July 11, 1979, approximately two years before the dates of infringement in the current action: June 20 and September 4–5, 1981.

In an order dated March 18, 1983, this court determined that defendants had committed five instances of copyright infringement and assessed the statutory minimum, $250, per infringement under 17 U.S.C. § 504(c)(1). The *Springsteen* case differs from the instant action, in that the public performance was by means of a live band.

However, that suit should have put plaintiff on notice that "public performance" applied to records and juke boxes, and not simply live performances. Defendants were represented by the same attorney, Anthony J. Villani, in both actions. Defendants filed interrogatories in the *Springsteen* action on September 25, 1979, again well before the dates of the infringements in the instant action. Interrogatory 6 asked plaintiffs to state whether the said performance was live. In Interrogatory 6(B), defendants asked:

B. If not a live performance:

(1) Describe the "public performance."

(2) Describe the instrument which gave the "public performance."

(*See* Item 31, p. 2).

At his deposition of July 11, 1984, Mr. Cipriana affirmed that he discussed the *Springsteen* suit with Mr. Villani who, based on the above interrogatory, was obviously aware that "public performance" encompassed more than live performances (Item 25, p. 59).

■ The court finds that the above amply demonstrates Mr. Cipriana's reckless disregard of plaintiffs' rights. It is also clear that if Mr. Cipriana did not actually know of the applicability of the copyright laws to non-live performances, he certainly should have known. Based upon the undisputed facts outlined above, the court concludes that defendants willfully infringed plaintiffs' copyrights and so are entitled to damages under 17 U.S.C. § 504(c)(2).

While plaintiffs can now receive a maximum of $50,000 per infringement, they request $2,000. After taking into account the willful nature of the infringement, the court has determined that plaintiffs are entitled to damages in the amount of $750 per infringement.

#### C.  *Costs and Attorney's Fees*

■ Under 17 U.S.C. § 505, the court may allow for full recovery of costs by any party. Plaintiffs have requested $76.80 to cover the filing fee and fee for service. Plaintiffs are awarded these costs.

Plaintiffs have also moved for attorney's fees. Under section 505, the court, in its discretion, can provide reasonable attorney's fees as part of the costs. Plaintiffs claim a total of 41.25 hours, at a rate of $80 per hour. Neither the amount of time nor the rate is unreasonable.

In view of the long history preceding this action and defendants' willful infringement, plaintiffs are awarded $3,300 in attorney's fees.

Plaintiffs' motion for summary judgment is granted. Defendants committed four instances of willful copyright infringement. Defendants are permanently enjoined from infringing all plaintiffs' copyrights in any manner.

Plaintiffs are awarded $750 per violation, for a total of $3,000. 17 U.S.C. § 504(c)(2). Plaintiffs are awarded $76.80 in costs and $3,300 in attorney's fees.

So ordered.